**John H. JONES, Appellant,**

v.

**GETTY OIL COMPANY, Appellee.**

**No. 14847.**

Court of Civil Appeals of Texas,
San Antonio.

July 22, 1970.

Rehearing Denied Sept. 16, 1970.

Cayton, Gresham & Fulbright, Lamesa,
for appellant.

Turpin, Smith, Dyer, Hardie & Harman,
Irby L. Dyer, Midland, Clyde E. Willbern,
Cloy D. Monzingo, Houston, for appellee.

BARROW, Chief Justice.

This appeal presents the unique question
of the right of the mineral lessee to use
the vertical space over the land for the
erection of pumping units to such height
that they prevent the landowner from irri-
gating much of his land by an automatic
sprinkler system in use at the time the
oil wells were drilled. Appellant John H.
Jones, brought this suit seeking an injunc-
tion to prevent appellee, Getty Oil Compa-
ny, and two of its employees from main-
taining said pumping units and to obtain
permanent or temporary damages. The
jury found that it was not reasonably nec-
essary for Getty to erect its pumping units
at such excess height which would cause

permanent damage to Jones' land, resulting in a reduction of the cash market value of same by $117,475.00. Defendants' motion for judgment non obstante veredicto was granted and Jones has timely perfected his appeal as to Getty from the take-nothing judgment entered in said suit.

Jones urges that the judgment non obstante veredicto was erroneously granted in that there is competent evidence to support the verdict of the jury and permanent damages or, in any event, a judgment for temporary damages to date of trial as found, in the amount of $19,000.00, together with an injunction enjoining the continued maintenance of the pumping units at a height which will obstruct his irrigation system.

■ It is a fundamental rule that in considering whether a judgment non obstante veredicto was properly granted we must consider the evidence in the light most favorable to the jury finding, giving credit to all evidence supporting such finding and indulging every reasonable presumption in support of the verdict while disregarding all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex.Sup.1965); Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547 (1962); International Service Ins. Co. v. Maryland Casualty Co., 421 S.W.2d 721 (Tex.Civ. App.—San Antonio 1967, no writ).

In 1955 Jones purchased the surface only of Section 4, Block C–31, Public School Lands, Gaines County, Texas, except for five acres in the southwest corner of such tract which belonged to a church. He owns no interest in the oil, gas or other minerals in said land. The mineral lease under which Getty claims is dated January 15, 1948, and comprises the west one-half of Section 4, except for the five acres which belong to the church. However, Getty owns only 120 acres of such leasehold with the remainder being owned and operated by Amarada Petroleum Corporation. The mineral lease of the east one-half of Section 4 is owned and operated by Adobe Oil Company.

At the time Jones purchased his interest in this section there was an oil well equipped with a rod beam pumping unit located near the NW corner of such section. Jones is a farmer with cotton being the primary crop raised on this land. After he purchased the land, Jones drilled seven water wells for the irrigation of his crops, thus making same much more productive. Between 1956 and 1963, Jones irrigated the land, initially with hand-moved equipment and later with power-roll equipment. Labor became increasingly difficult to obtain, and in 1963 he installed a self-propelled irrigation system known as a "Valley System." This system consists of a pipe about 1300 feet long mounted seven feet above the ground on a series of towers, which automatically rotates clockwise from a pivot point. The only labor required is moving the unit from one pivot point to another. There are six pivot points on this section which irrigate all the land except for the corners and small areas between the pivot perimeters. At the time the Valley System was installed the only oil well was in the northwest corner of the section, and although the pumping unit on same extended over seven feet in height it was located outside the perimeter of the northwest pivot and thus did not interfere with the irrigation system. In late 1967 and early 1968 development was had of the mineral leases on this section. In January of 1968, Getty drilled its Bice No. 1 and Bice No. 2 on its 120 acres. Both wells were completed as producers; however, since they did not flow, beam type pumping units were installed on each well. One pumping unit extends about seventeen feet above the ground at the top of its upstroke and the other unit about thirty-four feet. Both units extend considerably above the seven-foot minimum height which can be cleared by Jones' Valley System, thus preventing the use of four of the six pivot points in this section, and thereby causing a depreciation in the market value of the land through reduced production potential.

Adobe drilled four wells on the land leased by it about the same time and installed beam type pumping units on each of these wells. Two were drilled outside the perimeter of the pivot points of the irrigation system. The two within the system were placed in concrete cellars or pits which were constructed so that the upstroke of the pumping unit extends less than seven feet above the ground, thus the Valley System will operate over the pumping unit. Amarada operates two oil wells within the perimeter of Jones' Valley System; however, both wells are equipped with hydraulic pumping units whereby the equipment at the well head extends less than seven feet in height so as not to interfere with the Valley System. The power units for such hydraulic units are located outside the perimeter of the Valley System. The battery tanks belonging to Getty were located outside the perimeter of the Valley System and do not interfere with same.

Getty's lease granted the described land to it "for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines, houses for its employees, and other structures thereon to produce, save, take care of, treat, transport, and own said products." Lessee agreed to bury all pipe lines below ordinary plow depth, but there is nothing else in the lease relative to vertical height of any installation. There were no allegations of negligence by Jones nor any attempt to prove same. Jones does not contest Getty's right to determine the location of its oil wells or its right to install some type of pumping equipment on said wells which will not otherwise produce. Jones' basic contention is that, under the facts and circumstances shown in this record, it was not reasonably necessary for Getty to install and maintain the pumping units at such height as to prevent Jones from using his irrigation equipment.

The oil and gas lease gave Getty the dominant estate. It thus had the right to use as much of the premises, and in such a manner, as was reasonably necessary to comply with the terms of the lease and to effectuate its purposes. Humble Oil & Refining Co. v. Williams, 420 S.W. 2d 133 (Tex.Sup.1967); Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S. W.2d 410 (1954); Warren Petroleum Corp. v. Monzingo, 157 Tex. 479, 304 S. W.2d 362, 65 A.L.R.2d 1352 (1957); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961); Keeton & Jones, Tort Liability and the Oil and Gas Industry, 35 T.L.R. 1. In Warren Petroleum Corp. v. Martin, supra, the Supreme Court in discussing the relationship between the owners of the dominant estate and the servient estate said: "Of course each must exercise their respective rights of state with due regard for the rights of the other." See also: Reading & Bates Offshore Drilling Co. v. Jergenson, 453 S.W.2d 853 (Tex.Civ.App. —Eastland 1970, no writ); McMahon, Rights & Liabilities With Respect to Surface Usage by Mineral Lessees, Sixth Annual Institute on Oil and Gas Law, 231, 232. Although each case must stand on its own particular facts, the above authorities recognize that the question presented is usually one of fact.

We have examined the entire record in this cause. Although there is sharp disagreement among the witnesses on matters involving expressions of opinion, the testimony of R. S. Gunther, an independent petroleum engineer, is sufficient under the "no evidence" test to support the jury finding that the installation by Getty of the pumping units to a height in excess of seven feet was not reasonably necessary under the facts and circumstances of this case. He testified that the pumping units could be safely and efficiently installed in cellars or pits so that they would not interfere with Jones' irrigation system. Furthermore, he said the cost of such installation would not be excessive. His opinion was

corroborated by the fact that Adobe has two such installations on its lease and, under the uncontradicted testimony of the pumper on such units, there have been no difficulties with either installation.

■ Thus it is seen that in this record, as distinguished from that in Humble Oil & Ref. Co. v. Williams, supra, which case is heavily relied upon by Getty, *there was proof* that Getty used more of the land than was reasonably necessary to conduct its operation. There was proof that a pumping unit would have sufficed for Getty's purposes although placed in a cellar or pit, so that its upstroke was less than seven feet above the surface of the ground. We see no logical reason for applying a different rule where more of the vertical space immediately above the well is used than to a use of more of the lateral surface than is reasonably necessary to accomplish the purposes of the lease. It is true that drilling or reworking operations will necessarily interfere with the operation of Jones' irrigation system, in that such operations require equipment in excess of seven feet above the ground. However, such operations would obviously be only of a temporary nature and would not seriously interfere with his use of the surface.[1] We conclude that the trial court erred in holding that there was no evidence to support the jury finding that it was not reasonably necessary to install such pumping units this height above the ground.

It is necessary to consider the cross-points asserted herein by Getty before determination of the proper judgment to be entered in this cause. Getty complains by seven cross-points of the error of the trial court in overruling its objections to Special Issue No. 1[2] and the instruction given therewith, in that it does not fairly submit the right given to Getty under the lease and authorities heretofore set forth to use so much of the land as was reasonably necessary to produce the oil. We sustain such contention. The issue and accompanying instruction is based on the relative convenience and inconvenience of Getty and Jones. On the other hand, Getty actually has the right to use such land as was "reasonably necessary" irrespective of the inconvenience of Jones.

■ Jones argues that the issue and instruction are substantially the same as submitted in Getty Oil Company v. Royal, 422 S.W.2d 591 (Tex.Civ.App.—Beaumont 1968, writ ref'd n. r. e.). It is seen, however, that different issues are presented by *Royal.* There the lessee sought an injunction enjoining the landowner from erecting gates across the private roads on the lease. Obviously, the landowner had the right to erect such gates unless same were an unreasonable interference with the right of lessee to operate its lease. In determining the issue of unreasonable interference, the relative convenience of the parties would be involved. Here Getty had the absolute right to use so much of the land as was reasonably necessary to carry out the purpose of the lease. We do not believe that such a right is fairly presented by an issue

---

1. Both of Getty's wells were drilled in about two weeks time and Getty graciously commenced same after the 1967 crops were gathered.

2. Special Issue No. 1:
Do you find from a preponderance of the evidence that Getty Oil Company's erection of the pumping units in question at its Numbers One and Two Wells at such excess in height so that Plaintiff's sprinkler system will not pass over the same constituted a use of the surface of the land in question in a manner which is not reasonably necessary?

In answering the foregoing Special Issue, you are instructed that a determination of whether the erection of such pumping units by Getty Oil Company constitutes a use of the surface of the land in question in a manner which is not reasonably necessary involves weighing the degree of harm or inconvenience, if any, such pumping units cause to John H. Jones against the utility, if any, of such pumping units to Getty Oil Company and the suitability of other measures, if any, which would substantially serve the purpose of such pumping units to Getty Oil Company at less or no inconvenience or harm, if any, to John H. Jones.

weighing the relative convenience and inconvenience of the parties. Furthermore, we believe that use of term "excess in height" in the issue submitted herein was a comment on the weight of the evidence by reference to the height as "excessive." Such errors were properly called to the attention of the court by timely objections and since they go to the basic issue in dispute herein, require a retrial of the case.

Upon a retrial of the case if evidence is again presented by Jones to show that Adobe placed its pumping units in cellars or pits, all the evidence relative to why they were so placed should be presented to the jury. The other alleged errors are not likely to occur again, at least not in the same manner, and it is therefore unnecessary to consider same.

The judgment of the trial court is reversed and the cause remanded for a new trial.

KLINGEMAN, Justice.

I respectfully dissent. I would affirm the judgment of the trial court.

I have found no case where the lessee's use of the vertical space over the well site has been limited or restricted, or any case where a lessee has been held liable for damages for excessive use of such air space.

The majority opinion poses some interesting problems. There is nothing unique about a conventional beam type pumping unit—in terms of height—as compared to a drilling rig, workover rig, storage tanks, separators, and other surface equipment, which must always be present in connection with the drilling and production of oil wells. A pumping unit on a producing well which does not flow is just as necessary and essential to effectuate the purposes of the lease as is a drilling rig used to drill a well on the leased premises. Such drilling rigs are of a height greatly in excess of the pumping units here involved, and the use of such drilling rigs at the well sites of Getty's two wells, or anywhere within the sweep of appellant's Valley System irrigation equipment would just as effectively prevent the use of such type of irrigation equipment as would the pumping units here involved. It would be possible, although more expensive, to place such rigs in an excavation or pit of sufficient depth that the top of such rigs would not extend over seven feet over the surface of the land, or directionally drill such wells from a location that would not interfere with the operation of appellant's irrigation system. The majority opinion recognizes that drilling or reworking operations will necessarily interfere with the operation of appellant's irrigation system, in that such operations require equipment in excess of seven feet above the ground, but states that such operations would not seriously interfere with the use of the surface since they would be temporary in nature. It is possible that drilling operations might extend over a considerable period of time, dependent upon the number of wells drilled, their depth, problems which might be encountered in drilling, and other factors; and it is also possible that production of oil from the leased premises might be of a temporary nature, in that the production might cease at any time. It is to be noted that Getty's two wells were drilled in January of 1968, and this suit, in which both permanent and temporary damages are sought, was filed in June of 1968, a period of approximately six months.

Under the majority holding, a fact question of reasonable use of the surface of the leased premises would arise at any time a lessee uses or places on the leased premises a drilling rig, workover rig, pumping unit, compressors, storage tanks, or other equipment or structures necessary for the drilling and production of oil and gas, which interfere with the use of any farming equipment owned by the landowner prior to the time the oil lessee moved such equipment or structures on the leased premises. Here the use of equipment that extends in excess of seven feet over the sur-

face of the well site had been held to be an unreasonable use. I do not believe that under a customary oil and gas lease as involved here the lessee's use of the surface is so restricted.

The majority opinion correctly states that the oil and gas lease gave Getty the dominant estate; that it had the right to use as much of the premises and in such a manner as was reasonably necessary to comply with the terms of the lease, and to effectuate its purposes; and that the owners of the dominant estate and the servient estate must each exercise their respective rights with due regard for the rights of the other. I have no quarrel with such established principles, but disagree with the application thereof made by the majority. In some manner the lessee's dominant estate has somehow become subservient and inferior to the landowner's servient estate.

In my opinion, Getty's operations here complained of took place within the legitimate operating area which it was entitled to occupy as a holder of the dominant estate to the exclusion of appellant, the owner of the servient estate.[1] I would hold as a matter of law that the erection and maintenance of the conventional pumping units used by Getty in the manner that they were used did not constitute an unreasonable use of the surface of the land, and that Getty was fully authorized under the terms and provisions of its lease to so operate such pumping units.

I would affirm the judgment of the trial court.

1. I have found no cases where a "reasonable use" of the surface has been so narrowly limited as in the instant case. Here, any use of the air space in excess of seven feet over the well site has been held to be an unreasonable use of the surface of the land. There are numerous cases holding a lessee not liable for damages arising on the well site and the immediate area thereto. Some of the cases speak in terms of "no duty." In Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954) the Court held that the lessee was not liable for damages incurred when cattle owned by a surface lessee drank oil from a pool located about five feet from the well, stating that the oil lessee was under no duty to fence the well to prevent cattle from entering upon the land near the well and drinking oil on the ground, and that the only duty owed to the surface lessee was not to intentionally, willfully, or wantonly injure his cattle. Since Warren's operations took place within the legitimate area which it was entitled to occupy as the holder of the dominant estate, it was under no duty to keep Martin's cattle out of the area. In Pure Oil Co. v. Gear, 183 Okl. 489, 83 P.2d 389, the lessee had constructed an open ditch from some of his equipment at the well to a pond which retained water, and plaintiff's cattle came to the ditch and drank water and were poisoned. The Court held that the defendant, as mineral lessee, had the *exclusive* (emphasis added) right to use the space required for the construction of the ditch and pond, that the cattle in drinking from such ditch were trespassers, and that no liability attached. The Court said: "The true rule is that under the ordinary oil and gas lease, the lessee, in developing the premises in the production of oil and gas, is entitled to the possession and use of all that part of the leased premises which is reasonably necessary in producing and saving the oil and gas. This extends to the space required upon which to erect tanks or dig pits necessary to store or confine such refuse matter as may come from the wells on the leased premises in the course of ordinary prudent operations." Other cases similarly holding are Sinclair Prairie Oil Company v. Perry, 191 S.W.2d 484 (Tex.Civ.App.—Texarkana 1945, no writ); Placid Oil Co. v. Lee, 243 S.W.2d 860 (Tex.Civ.App.—Eastland 1951, no writ); Baker v. Davis, 211 S.W.2d 246 (Tex.Civ.App.—Eastland 1948, no writ); and Trinity Production Company v. Bennett, 258 S.W.2d 160 (Tex.Civ.App.—Amarillo 1953, no writ). Several of these cases involved wells with pumping units, and some involved injuries to cattle by the pumping units at the well site. Will a different rule be applied to an intrusion on the well site premises by cattle of a landowner, which is held to be a trespass with no liability, and an intrusion on the same well site premises by the landowner's irrigation system? I can see no logical reason for such a distinction.