**GETTY OIL COMPANY, Petitioner,**

v.

**John H. JONES, Respondent.**

**No. B–2391.**

Supreme Court of Texas.

May 26, 1971.

Rehearing Denied July 28, 1971.

Second Rehearing Denied Oct. 6, 1971.

Clyde E. Willbern and Cloy D. Monzingo, Houston, Turpin, Smith, Dyer, Hardie & Harman, Irby L. Dyer, Midland, for petitioner.

Cayton, Gresham & Fulbright, Karl Cayton and William E. Fulbright, Lamesa, for respondent.

STEAKLEY, Justice.

John H. Jones, respondent, the surface owner of a tract of land in Gaines County, Texas, sued for an injunction to restrain Getty Oil Company, petitioner, an oil and gas lessee, from using vertical space for pumping units that prevent the use by him of an automatic irrigation sprinkler system, and for damages. Upon trial, the jury

found that it was not reasonably necessary for Getty to install pumps that prevented the operation of the irrigation system; and that by doing so Getty decreased the market value of the land $117,475, and decreased the value of the use of the land from the time of erection of the pumps until the trial by $19,000. The trial court granted Getty's Motion for Judgment Non Obstante Veredicto on the ground there was no evidence that Getty used more lateral surface than reasonably necessary. Upon appeal, the court of civil appeals reversed the judgment of the trial court, holding that vertical as well as lateral space was restricted to that which is reasonably necessary. The court remanded the case, however, on the further holding that the trial court had erroneously instructed the jury. One Justice dissented. 458 S.W.2d 93. Both parties have filed applications for writ of error. We affirm the judgment of the court of civil appeals.

In 1955 Jones purchased the 635 acre tract of land in question, which was subject to prior mineral leases in which he acquired no interest. Getty holds an oil, gas and mineral lease covering 120 acres in the west half of the tract; Amerada Petroleum Corporation holds a similar lease covering the remainder of the western half of the tract. The lease for the eastern half of the tract is held by Adobe Oil Company.

Jones has drilled seven irrigation wells since 1955, five of which are used to irrigate this tract of land. Prior to 1963, he used hand-moved, and later power roll, irrigation equipment to irrigate the tract. In 1963 he installed a self-propelled sprinkler irrigation system known as the "Valley System." This system consists of 1,300 feet of pipe supported at a height of seven feet above the ground by a series of steel towers which rotate in a clockwise direction around a pivot point. The system can negotiate most obstacles which are less than seven feet in height. The pivot points are connected by underground pipes to the irrigation wells. Labor is required only to move the system from one pivot

point to another. There are six pivot points which provide for irrigation of the entire tract except for a few corner areas. At the time Jones installed the system Getty had one producing oil well in the northwest corner of the tract. This well had a beam-type pumping unit considerably over seven feet in height; however, the unit was outside the circumference of the closest pivot point and did not interfere with operation of the sprinkler system.

In December of 1967 Getty drilled two additional wells on its 120 acres which produced but would not flow. Getty installed two beam-type pumping units, one of which is seventeen feet high at the top of its upstroke, and the other thirty-four feet high. Because of this height, the pumps preclude the use of four pivot points of Jones' irrigation system with a consequent depreciation in the value of the land because of the reduction in its production potential. Getty also has battery tanks placed on the land that are outside the circumference of the irrigation system and do not interfere with it.

Prior to the time Getty developed its two new wells, Adobe had drilled four wells on the eastern half of the Jones tract and had installed beam-type pumping units on each of the wells. Two of these wells were outside the circumference of the closest pivot points of the sprinkler system; the others would have interfered with the system and were placed in concrete cellars to provide clearance. In addition, the cellars were placed so that the support towers of the sprinkler system would pass around them. In its portion of the tract Amerada also has two wells within the circumference of the irrigation system but both utilize hydraulic pumping units which are less than seven feet in height at the well head and hence do not interfere with the irrigation system. The power unit for these hydraulic pumps is also located so as not to interfere with the system.

The oil and gas lease grants Getty the land "for the purpose of investigating, ex-

ploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines, houses for its employees, and other structures thereon to produce, save, take care of, treat, transport, and own said products." The lease obligates the lessee to bury all pipe lines below ordinary plow depth when required by the lessor. The lease contains no specific provision concerning the vertical usage of the land.

Jones does not charge Getty with negligence nor deny Getty's right to determine the location of its wells and to install some type of pumping equipment when necessary for production. His position is that under the facts and circumstances it was not reasonably necessary for Getty to install pumping units in the manner which denies him the use of his irrigation equipment.

■ Getty's principal contention is that it has a right to exclusive use of the superadjacent airspace above the limited surface area occupied by the pumps and that only the lateral surface of the land should be subject to the established rule of reasonably necessary surface usage. We disagree. It has long been recognized that ownership of real property includes not only the surface but also that which lies beneath and above the surface. The use of land extends to the use of the adjacent air. See United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); Broughton v. Humble Oil & Refining Co., 105 S.W.2d 480 (Tex.Civ.App.—El Paso 1937, writ ref'd); Schronk v. Gilliam, 380 S.W.2d 743 (Tex.Civ.App.—Waco 1964, no writ). Although the earlier cases were generally limited to a consideration of the lateral surface, we held in Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961), that the rule of liability of the mineral lessee for negligently and unnecessarily damaging the surface estate includes the subsurface. This decision implicitly recognized that there are vertical as well as lateral boundaries to the use of the surface

hold explicitly that the reasonably necessary limitation extends to the superadjacent airspace as well as to the lateral surface and subsurface of the land. estate by the oil and gas lessee. We now

Getty further says that if it has acted in a reasonable manner in accomplishing the purposes of the oil and gas lease, its right to so use the surface and the air above is absolute, and that the consequences to the owner of the surface estate are of no legal effect. The expert witnesses agreed that the beam-type pumping units used by Getty were more economical than the hydraulic pumping units; and there was no evidence of any intrinsic value to Getty from the extra expense of constructing below-surface cellars to house the beam-type units. So, Getty argues that their placement of the beam-type pumping units on the surface was authorized by the lease as a matter of law. The question to be resolved, then, is whether evidence may be entertained to show the effect of Getty's manner of surface use upon the use of the surface by Jones, together with the nature of alternatives available to Getty, in resolving the issue of reasonable necessity.

■ It is well settled that the oil and gas estate is the dominant estate in the sense that use of as much of the premises as is reasonably necessary to produce and remove the minerals is held to be impliedly authorized by the lease; but that the rights implied in favor of the mineral estate are to be exercised with due regard for the rights of the owner of the servient estate. Humble Oil & Refining Co. v. Williams, 420 S.W.2d 133 (Tex.Sup.1967); General Crude Oil Co. v. Aiken, 162 Tex. 104, 344 S.W.2d 668 (1961); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961); see Keeton & Jones, Tort Liability and the Oil and Gas Industry, 35 Texas L.Rev. 1 (1956); Comment, Land Uses Permitted an Oil and Gas Lessee, 37 Texas L.Rev. 889 (1959); Lambert, Surface Rights of the Oil and Gas Lessee, 11 Okl.L.Rev. 373 (1958); Davis, Selected Problems Regarding Lessee's

Rights and Obligations to the Surface Owner, 8 Rocky Mt.Min.L.Inst. 315 (1963). In another context we recently gave recognition to the surface soil as a natural resource in Acker v. Guinn, 464 S.W.2d 348 (Tex.Sup.1971): "[the mineral estate] owner is entitled to make reasonable use of the surface for the production of his minerals. It is not ordinarily contemplated, however, that the utility of the surface for agricultural * * * purposes will be destroyed or substantially impaired." The due regard concept defines more fully what is to be considered in the determination of whether a surface use by the lessee is reasonably necessary. There may be only one manner of use of the surface whereby the minerals can be produced. The lessee has the right to pursue this use, regardless of surface damage. Kenny v. Texas Gulf Sulphur Co., 351 S.W.2d 612 (Tex.Civ.App.—Waco 1961, writ ref'd). And there may be necessitous temporary use governed by the same principle. But under the circumstances indicated here; i. e., where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee.

The only evidence regarding reasonable means of irrigating this land is found in the testimony of witnesses presented by Jones. It was their testimony that a critical shortage of labor available to farms in the area necessitates the use of automatic sprinkling equipment in irrigating the land. Indeed, Jones testified that the decreasing availability of labor was the controlling factor in his installation of the self-propelled sprinkler system in 1963. Getty sought by cross examination of the witnesses to establish that manual irrigation would suffice, or that a reversible automatic sprinkler would be an adequate alternative for Jones; all, however, rejected manual irrigation as a realistic alternative because of the labor shortage. Neither did the witnesses consider the reversible system a suitable substitute since it would require supervision night and day to avoid collision with the pumps; and that, even if supervisory labor is available, loss of a day's watering would result from moving the system to its proper position by the reversal procedures.

Although disputed by Getty, there was evidence to show that it had reasonable alternatives for obtaining its oil. A petroleum engineer presented by Jones testified that the construction of cellars adequate for the two pumping units required by Getty would have cost less than $12,000 when the pumps were initially installed, and that natural air circulation would alleviate the danger of hydrogen sulfide gas collecting in the cellars. He further testified that installation of large hydraulic pumps would have initially cost less than $5,000 more than the present pumps and would have annual operations costing from $350 to $1,000 more per year. Another witness for Jones was a contract pumper for Adobe who was currently operating two beam-type pumps in cellars, together with twenty-five beam-type pumps on the surface. He testified that less maintenance was necessary on the units in the cellars than on the ones on the surface and that there was less leakage of hydrogen sulfide gas; he also testified that the prevailing winds ventilated the cellars.

■ The record thus indicates that the irrigation system currently in use affords Jones the most advantageous, and perhaps the only reasonable means of developing the surface for agricultural purposes. It is also indicated that there is available to Getty the two types of pumping installations—the beam-type pumps in cellars or the hydraulic pumps on the surface—which are reasonable alternatives to its present use of the surface; and that Getty's use of an alternative method of producing its wells would serve the public policy of de-

veloping our mineral resources while, at the same time, permitting the utilization of the surface for productive agricultural uses. Under such circumstances the right of the surface owner to an accommodation between the two estates may be shown, dependent, of course, upon the state of the evidence and the findings of the trier of the facts. Here, the trial court submitted the following special issue and accompanying instruction:

"Do you find from a preponderance of the evidence that Getty Oil Company's erection of the pumping units in question at its Numbers One and Two Wells at such excess in height so that Plaintiff's sprinkler system will not pass over the same constituted a use of the surface of the land in question in a manner which is not reasonably necessary?

"In answering the foregoing Special Issue, you are instructed that a determination of whether the erection of such pumping units by Getty Oil Company constitutes a use of the surface of the land in question in a manner which is not reasonably necessary involves weighing the degree of harm or inconvenience, if any, such pumping units cause to John H. Jones against the utility, if any, of such pumping units to Getty Oil Company and the suitability of other measures, if any, which would substantially serve the purpose of such pumping units to Getty Oil Company at less or no inconvenience or harm, if any, to John H. Jones."

■ We agree with the court of civil appeals that inclusion of the phrase "at such excess in height" in the issue was erroneous as a comment upon the weight of the evidence. Additionally, and as also recognized by the court of civil appeals, the accompanying instruction erroneously calls for a weighing of harm or inconvenience to Jones against the considerations pertaining to Getty. This is not the proper test, particularly in the suggestion that inconvenience to Jones may be a controlling

element. There must be a determination that under all the circumstances the use of the surface by Getty in the manner under attack is not reasonably necessary. The burden of this proof is upon Jones, the surface owner. Cf. Humble Oil & Refining Co. v. Williams, 420 S.W.2d 133 (Tex.Sup. 1967). Jones sought to discharge this burden by showing that the use which Getty is making of the surface is not reasonably necessary because of non-interfering and reasonable ways and means of producing the minerals that are available to Getty, the use of which will obviate the abandonment by Jones of his existing use of the surface, and that the alternatives available to Jones would be impractical and unreasonable under all the conditions. These are the elements to be considered by the trier of facts and the jury should be so instructed in resolving the issue of the reasonable necessity of the surface use by Getty, the mineral lessee.

■ We further hold, as urged by Getty, that in event it is ruled that Getty is making an unreasonable surface use, Getty will have the right to install non-interfering pumping units; and in such event Getty will not be liable in damages beyond the decrease in the value of the use of the land from the time the interfering pumps were installed to the time of their removal.

The judgment of the court of civil appeals is affirmed.

McGEE, Justice (dissenting).

I respectfully dissent.

The mineral lease under which Getty claims is dated January 15, 1948. Jones purchased the 635 acres in question in 1955, long after the execution of the lease. At the time of Jones' purchase of the surface, there was a well equipped with a rod and beam pumping unit, a tank battery and heater treater on the land. After his purchase, Jones, a cotton farmer, drilled seven water wells for the irrigation of his crops. Initially, between 1956 and 1963, Jones ir-

rigated the land with hand-moved equipment, then later in the same period with power-moved equipment. Still later, in 1965, he installed a self-propelled irrigation system consisting of 1300 feet of pipe mounted seven feet above the ground which rotate automatically from pivot points. The only labor thus involved is the moving of the unit from one pivot point to another.

In January, 1968, Getty completed two more producing wells on the land, both requiring pumping units. One of the units extends seventeen feet above the ground and the other extends thirty-four feet above the ground (at the top of the upstroke of the beam). These pumping units prevent the operation of Jones' Valley Irrigation System.

Jones does not charge Getty with negligence or contest Getty's right to determine the location of its oil wells or its right to install some type of pumping equipment. At the time the first well was drilled and a pumping unit installed, there was no question that Getty's action in so doing was authorized under the terms of the lease. Jones bought this surface with full knowledge of the lease and the presence of the original pumping unit and the possibility of the drilling of additional wells which might also require pumping units. Now, by changing the nature of his surface operations, Jones seeks to alter the terms of the prior mineral lease and to impose additional burdens on the oil and gas lessee which are not imposed by the original oil and gas lease.

It is fundamental that by the oil and gas lease, Getty obtained the dominant estate. Getty has the right to the use of as much of the premises as is reasonably necessary to comply with the terms of the lease and to effectuate its purposes. Humble Oil & Refining Co. v. Williams, 420 S.W.2d 133 (Tex.Sup.1967); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961); Warren Petroleum Corp. v. Monzingo, 157 Tex. 479, 304 S.W.2d 362, 65 A.L.R.2d 1352

(1957); Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954). There is no contention by Jones in this case that Getty is "using more land than necessary" to effectuate the purposes of the lease.

There is no express provision in the lease requiring that pumping units or other structures be placed in cellars beneath the top of the ground. Indeed, the lease specifically and expressly provides to the contrary. The oil, gas and mineral lease here involved is as follows:

"* * * grants, leases and lets, exclusively unto lessee the following described land in Gaines County, Texas: [describing W/2 Sec. 4, less 5 acres] and any and all lands or rights and interests in land owned or claimed by lessor adjacent or contiguous to the land above described."

The foregoing grant of land is modified only by a purpose clause as follows:

"* * * for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas, and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines, houses for its employees and other structures thereon to produce, save, take care of, treat, transport and own said products. * * *"

The lease deals expressly with the question of the horizontal and vertical locations of Getty's equipment and installations, as follows:

"* * * when required by Lessor, Lessee will bury all pipelines below ordinary plow depth, and no well shall be drilled within two hundred (200) feet of any residence or barn now on said land without Lessor's consent."

This case is simple. Getty claims the right to place pumping units on the top of its well sites to a height necessary to effectuate the purposes of its lease. Jones claims a right to come over the top of the

well site with his irrigation equipment at a point about seven feet above the ground. The two claimed rights cannot exist simultaneously. By the terms of the lease, Getty has the right to utilize the air space to a height above its well sites as is reasonably necessary to effectuate the purposes of the oil and gas lease.

The only specific provision of the lease requiring the lessee to bury equipment provides that the lessee must buy all pipe lines below ordinary plow depth when required by the lessor. To hold that roads, tanks, pumping units, power stations, telephone lines, houses for employees and other structures are, or might be, required to be buried by this clause or by the purpose clause is to give the lease an unreasonably strained construction. Here the parties dealt expressly with the subject of what, if any, of Getty's equipment must be buried below the surface. These express provisions require application of the principles of law stated in Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039:

"Implied covenants can only be justified upon the ground of legal necessity. Such a necessity may arise out of the terms of the contract or out of the substance thereof. One absolutely necessary to the operation of the contract and the effectuation of its purpose is necessarily implied whether inferable from any particular words or not. It is not enough to say it is necessary to make the contract fair, or that it ought to have contained a stipulation which is not found in it, or that, without such covenant, it would be improvident or unwise or would operate unjustly; for men have the right to make such contracts. Accordingly courts hesitate to read into contracts anything by way of implication, and never do it except upon grounds of obvious necessity."

Further, it is elementary that an express stipulation upon a matter excludes the possibility of an implication upon the same subject.

This Court should not rewrite the oil and gas lease which was of record when Jones purchased the property. The majority is, in the face of express language, reading into the lease an implied covenant requiring Getty to alter its operations at its expense to accommodate Jones in order that the latter may operate his farm more efficiently whenever and wherever the uses of the surface might change. To read the lease now, 22 years after the document was executed, in this manner is contrary to, rather than in accord with, the intention of the original parties to the agreement. Warren Petroleum Corp. v. Monzingo, *supra*. In *Monzingo*, the Court refused to imply an obligation upon the lessee to restore the surface of the leased premises to its original condition after expiration of a lease: "Admittedly the lease contained no such provision and one is not to be read into the contract by implication." 157 Tex. at 481, 304 S.W.2d at 363.

The majority opinion holds that testimony that pumping units could be installed in a cellar 24 feet below the top of the surface raises a fact issue as to how much air space above the top of the surface may be occupied by the oil and gas lessee's equipment which is being used to produce oil from the well. Such a holding would permit a jury to find that pumping units (and other oil and gas development and production equipment) must be located *below the surface of the earth*, despite the express provisions of the oil and gas lease and the holdings of our courts, thus depriving the oil and gas lessee of its *right to occupy* and use the surface for its oil and gas operations. See Warren Petroleum Corp. v. Martin, *supra*; Warren Petroleum Corp. v. Monzingo, *supra*; Humble Oil and Refining Co. v. Williams, *supra*; Texas Co. v. Daugherty, 107 Tex. 226, 176 S.W. 717 (1915); Gregg v. Caldwell-Guadalupe Pick-Up Stations, 286 S.W. 1083 (Tex.Comm. App.1926, holding approved); Stradley v. Magnolia Petroleum Co., 155 S.W.2d 649 (Tex.Civ.App.—1941, writ ref'd); Trinity Production Co. v. Bennett, 258 S.W.2d 160

(Tex.Civ.App.—1953, writ ref'd n.r.e.); Sinclair Prairie Oil Co. v. Perry, 191 S.W. 2d 484 (Tex.Civ.App.—1945, no writ); Baker v. Davis, 211 S.W.2d 246 (Tex.Civ.App. —1948, no writ); Grimes v. Goodman Drilling Co., 216 S.W. 202 (Tex.Civ.App.—1919, writ dism'd); Placid Oil Co. v. Lee, 243 S. W.2d 860 (Tex.Civ.App.—1951, no writ); Pitzer & West v. Williamson, 159 S.W.2d 181 (Tex.Civ.App.—1942, writ dism'd); Miller v. Crown Central Petroleum Corp., 309 S.W.2d 876 (Tex.Civ.App.—1958, no writ); Parker v. Texas Co., 326 S.W.2d 579 (Tex.Civ.App.—1959, writ ref'd n.r.e.); Cozart v. Crenshaw, 299 S.W. 499 (Tex. Civ.App.—1927, no writ); and Gulf Oil Corp. v. Walton, 317 S.W.2d 260 (Tex. Civ.App.—1958, no writ).

It is difficult to believe that this Court would hold that such testimony should render useless the express grant in the oil and gas and disregard prior court decisions. The oil and gas lease becomes a mere letter in the sand, to be washed away by the tidal wave which will be caused by the majority holding. If the majority is correct, then the lease does not mean what it says; the oil and gas lessee has the right to use the surface of the land and place the development and production equipment "thereon."

If the irrigation wells on Jones' land go dry and the best surface use becomes grazing cattle on the land, would this Court require the lessee to raise entrenched pumping units to avoid the danger of cattle falling into the hole or to fence around the units? I think not. Jones v. Nafco Oil and Gas, Inc., 380 S.W.2d 570 (Tex. Sup.1964); Warren Petroleum Corp. v. Martin, *supra*.

It should also be noted that the Court's opinion allows Jones to have his cake and eat it too. He purchased the land in question from the original lessor subject to an oil and gas lease, and no doubt paid less for the land than if he had bought the full fee title. Now the majority allows him to recover damages because the lessee is using the land in such a way as to in-

terfere with his farming operations. Further, the majority allows him to require the lessee to bury his equipment, thereby giving him a more valuable estate than the one he originally contracted to buy. The majority opinion, in effect, makes the dominant estate the servient estate and the servient estate the dominant estate.

Even if one agrees with the rationale of the majority, there is no reason or authority for requiring the lessee to bear the cost of burying the equipment when the only benefit inures to the lessor or surface owner.

The majority says:

"It is well settled that the oil and gas estate is the dominant estate in the sense that use of as much of the premises as is reasonably necessary to produce and remove the minerals is held to be impliedly authorized by the lease; *but that the rights implied in favor of the mineral estate are to be exercised with due regard for the rights of the owner of the servient estate.*" [Emphasis added.]

We said in Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863, at 866:

"We further held that since the lessee was the owner of the dominant estate he had the right to use so much of the premises as was reasonably necessary to the exclusion of the lessor in order to carry out the purposes of the mineral grant, *but even so that right must be reasonably exercised with due regard to the rights of the owner of the surface.*" [Emphasis added.]

We then held, at 867:

"The ultimate issue was whether Brown was *negligent* in the way and *manner* in which he disposed of the salt water." [Emphasis added.]

In Humble Oil and Refining Co. v. Williams, 420 S.W.2d 133, at 134 (Tex.Sup. 1967), we said:

"A person who seeks to recover from the lessee for damages to the surface has

the burden of alleging and proving either specific acts of negligence or that more of the land was used by the lessee than was reasonably necessary. Warren Petroleum Corp. v. Monzingo * * *; Robinson Drilling Co. v. Moses, Tex.Civ. App.1953, 256 S.W.2d 650, no writ; Finder v. Stanford, Tex.Civ.App.1961, 351 S. W.2d 289, no writ."

The majority recognizes that Jones does not charge Getty with negligence nor deny Getty's right to determine the location of its wells and to install some type of pumping equipment when necessary for production. Jones does not contend that Getty is using more surface than necessary.

There is no evidence in this record that the use of the beam-type unit was not reasonably necessary to produce these wells. No one complains about the height of the units from the base to the top. Thus, the vertical space occupied immediately above the well is admittedly not excessive. Jones is contending that Getty, though free from negligence, is liable for damages, and should be forced to bury its equipment at Getty's expense, to permit Jones to employ a method of irrigation that can pass over the well site. This Court is rewriting the oil and gas lease covering the land subsequently purchased by Jones, simply because of inconvenience to Jones.

Prior decisions have contained statements that the oil and gas lessee and the lessor or surface owner must exercise its right with due regard for the rights of the other. None of the decisions allows recovery of damages unless the contract requires payment of damages, Meyer v. Cox, 252 S.W.2d 207 (Tex.Civ.App.—1952, writ ref'd), absent a showing that the owner of the dominant estate has exercised its rights in a negligent manner or has used more land than is reasonably necessary to effectuate the purposes of the lease. Even if the majority is of the opinion that the injunction requiring the lessee to employ a different manner of pumping its wells is justified, *there is no basis in law for allowing the surface owner to recover damages.* Injunctions have been granted or denied under the "due regard" theory, but *no case* has been cited, nor have I been able to find one, which would allow recovery of damages on this theory.

I agree with the dissenting opinion filed in the Court of Civil Appeals, 458 S.W. 2d at 97, and would affirm the judgment of the trial court that Getty's use of the land is reasonable as a matter of law.

POPE, J., joins in this dissent.

## ON MOTION FOR REHEARING

STEAKLEY, Justice.

There are stated misconstructions of the Court's opinion in Getty's Motion for Rehearing and in some of the supporting briefs by friends of the Court. Some we will noitce. We do not hold that a mineral lessee's surface use may be found unreasonable without regard to the surface uses otherwise available to the surface owner. The reasonableness of a surface use by the lessee is to be determined by a consideration of the circumstances of both and, as stated, the surface owner is under the burden of establishing the unreasonableness of the lessee's surface use in this light. The reasonableness of the method and manner of using the dominant mineral estate may be measured by what are usual, customary and reasonable practices in the industry under like circumstances of time, place and servient estate uses. What might be a reasonable use of the surface by the mineral lessee on a bald prairie used only for grazing by the servient surface owner could be unreasonable within an existing residential area of the City of Houston, or on the campus of the University of Texas, or in the middle of an irrigated farm. What we have said is that in determining the issue of whether a particular manner of use of the dominant mineral estate is reasonable or unreasonable, we cannot ignore the condition of the surface

itself and the uses then being made by the servient surface owner. When we take judicial notice of the relatively few reported cases of conflict which have arisen between the two estates on the more than 378,000 oil and gas wells that have been drilled, operated and produced in this State, many of them within cities, parks, lakes, and bays and on farms, prison lands and industrial sites, it is indicated that the usual and customary practice of the oil and gas operators of this State is to take due consideration of the uses being made by the servient surface owner. There is evidence of this in the alternative methods employed by Amerada and Adobe under their leases of other portions of the Jones tract. As indicated in the Court's opinion, if the manner of use selected by the dominant mineral lessee is the only reasonable, usual and customary method that is available for developing and producing the minerals on this particular land then the owner of the servient estate must yield. However, if there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use. These considerations involve questions to be resolved by the trier of the facts.

■ A single or a multiple issue submission may be in order depending on the facts and circumstances in a given situation. The evidence and circumstances here are such that a proper initial inquiry would be whether Jones had reasonable means of developing his land for agricultural purposes other than by use of the sprinkler system in question. If this is found to be the case, Jones must yield to the surface use adopted by Getty since it is not contended that the beam-type pumps installed by Getty are otherwise unreasonable. If such is not found to be the case, Jones is under the burden of a second showing that Getty's present manner and method of use on this land is unreasonable because there are alternative methods used in the industry on this type of property which are available to Getty whereby it can produce its wells without interfering with the existing uses of the servient estate being made by Jones. If this is found to be the case, Getty is bound to convert to a noninterfering use. We have not held, as some have stated, that the issue is a question of inconvenience to the surface owner. To the contrary, the instruction accompanying the special issue submitted to the jury in this case was ruled erroneous because it indicated exactly this.

■ We also make clear, in response to Jones' Motion for Rehearing, that the ruling of the court of civil appeals with respect to the admissibility of evidence concerning the acts of Adobe in placing its pumps in cellars, with which we agreed, is the law of the case upon retrial.

The Motions for Rehearing are overruled.

Concurring opinion by GREENHILL, J.

WALKER, J., concurs in the Order.

McGEE, J., dissenting.

GREENHILL, Justice (concurring).

The decision in this case can rest on a narrower basis, and I would prefer a narrower holding.

As I understand the record, before Getty installed its beam type pump within the irrigated area of Jones, there were already two different types of pumping units in operation in the immediate area. Adobe Oil Company had placed its pumping units in concrete cellars; and an Adobe pumper testified that they required less maintenance, and leaked less sulphide gas than the surface pumps. Amerada had installed its two wells with non-interfering hydraulic pumps.

So when Getty got ready to put its pumps in the irrigated area, it had three choices, two of which would not have interfered with the existing irrigation system. It chose to use the surface beam type pump and thus chose to exercise what it regarded as its rights whether it injured Jones or not. In my opinion, the above facts and circumstances constitute some evidence to support the jury's finding that Getty's use of the surface was in a manner which was not reasonably necessary.

While the opinion of the court points out the facts that the irrigation system was already in existence when Getty installed its pump, and that others in the area were using different ways to produce the oil, the court's holding is not expressly limited to conditions in existence when Getty's pumps were installed on the irrigated area. Perhaps it would be dictum for the court to say more. But so that there might be no misunderstanding at least as far as I am concerned, I would limit this holding to the conditions at the time the pumps were installed. I would not hold that Getty, or anyone else, would have to move its pumps if they were in place before Jones purchased and installed his irrigation system. For example, if Jones decided to use a mobile irrigation system in the northwest corner where Getty had had its surface pump already operating, my opinion as to how the case should be decided would be different. I would think that the surface owner could not compel the oil and gas lessee to change its operations because the surface owner decided to change his operations. At least that would be a different ball game. In that event, it would seem proper to me for the surface owner to pay for the necessary changes in the oil and gas lessee's operations, or at least to contribute to such expense, depending in part on what benefit there might be to such lessee.

So I regard the holding in this case as being a narrow one, and as applying to a situation where, viewing the record in the light most favorable to the jury's verdict, the oil and gas lessee deliberately chose to install its surface pumps so as to destroy or seriously impair an existing surface irrigation system, where the evidence shows that it had at least two alternative choices which apparently seemed reasonable enough to other oil operators on the same property.