NO. 07-02-0394-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



MAY 27, 2004


______________________________



FLOYD DAVIS and LLOYD DAVIS, 



 Appellants


v.



DEVON ENERGY PRODUCTION COMPANY, L.P., 


 

 Appellee


_________________________________



FROM THE 121ST DISTRICT COURT OF TERRY COUNTY;



NO. 16,032; HONORABLE KELLY G. MOORE, JUDGE


_______________________________



Opinion


_______________________________



Before QUINN, REAVIS and CAMPBELL, JJ.

 Floyd Davis and Lloyd Davis (the Davises) appeal from a permanent injunction
entered against them and in favor of Devon Energy Production Company, L.P. (Devon). 
The dispute arose from the oil and gas operations by Devon on land the surface of which
the Davises leased. Four points are before us. They concern whether 1) the trial court
erred in failing to join the Myrtle Davis Trust as a necessary and indispensable party, 2) the
evidence was legally and factually insufficient to support the trial court's finding that a 1991
letter and a 1997 letter were not enforceable agreements to which Devon was bound, 3)
the evidence was legally and factually insufficient to support the finding that caliche was
a reasonably necessary construction material, and 4) the evidence was legally and factually
insufficient to support the finding that the Davises interfered with and unreasonably
restricted Devon's right to use the surface for its oil and gas operations. We affirm the
judgment. 

Background 


 Devon is a mineral lessee and operator of the North Welch Unit (Unit) near Welch,
Texas. The Davises either own or lease the surface of various parcels of land within that
Unit and conduct farming operations thereon. However, they own no interest in the
minerals underlying the surface.

 Next, the roads utilized by Devon to conduct its operations are non-compacted dirt. 
According to the record, they become difficult to use after it rains or the surface tenants
irrigate their land. Additionally, the Davises have plowed over the lease roads at their
discretion and moved them to other locations. These circumstances have led to Devon's
employees and contractors being unable, at times, to locate or use the roads to access the
wells, particularly when driving trucks and hauling heavy equipment or chemical treatments. 
Eventually, Devon proposed to make the lease roads permanent by building them with
caliche. The Davises opposed this. 

 Devon filed suit seeking both a declaration that it had a superior right to use the
surface of the land and a permanent injunction to enjoin the Davises from interfering with
the exercise of Devon's rights. By judgment dated June 21, 2002, the trial court entered
a judgment favorable to Devon, determined that the proposed use of the land by Devon
was reasonable and necessary and that the use of caliche as a construction material was
not unreasonable, and permanently enjoined the Davises from hindering or interfering with
Devon's oilfield operations, which included the construction of permanent caliche roads.

Point One - Joinder


 In their first issue, the Davises argue that the Myrtle Davis Trust (the Trust) was a
necessary and indispensable party to the suit. (1) Thus, the trial court could not litigate the
dispute without its joinder, they continue. The record illustrates that the Trust owned a
portion of the surface within the Unit and leased it to the Davises. Furthermore, it was not
made a party to the litigation. Nevertheless, this circumstance does not mandate reversal
of the judgment, and we overrule the issue. 

 As a general rule, trial courts exercise broad discretion in matters of joinder. 
Williamson v. Tucker, 615 S.W.2d 881, 886 (Tex. Civ. App.-Dallas 1981, writ ref'd n.r.e.). 
Furthermore, a person's absence will seldom deprive a court of jurisdiction to adjudicate
the rights of those who are present. Pirtle v. Gregory, 629 S.W.2d 919, 920 (Tex. 1982). 
 The nature of the suit at bar was one for injunctive relief against those who
attempted to interfere with the exercise by Devon of its rights under the mineral lease. 
Those purporting to interfere with Devon's actions, according to the record, were Lloyd and
Floyd Davis, not the Trust. Thus, the Trust was not an indispensable party. See Parr v.
Merritt, 532 S.W.2d 154, 159 (Tex. Civ. App.-Fort Worth 1976, writ ref'd n.r.e.) (holding that
since Merritt sought only to enjoin Parr from obstructing a roadway, all the purported
owners of the roadway were not necessary parties to the proceeding). 

 Moreover, we perceive no need to join the Trust to completely adjudicate the
legitimacy of the conduct by the Davises viz Devon. Again, it is the Davises who excluded
Devon from the property and threatened its employees, not the Trust or its representatives. 
Whether they were lawfully entitled to do so does not necessitate the involvement of the
Trust. And, that resolution of the dispute may have involved the declaration of rights arising
from the mineral lease is of no moment since that would not prejudice the Trust. Simply
put, the Trust is free to pursue its own recourse against Devon if it concludes that Devon
acted improperly. The prior adjudication rendered between the Davises and Devon will not
bar or otherwise prejudice that. Tex. Civ. Prac. & Rem. Code Ann. §37.006(a) (Vernon
1997) (stating that a declaration of rights does not prejudice the rights of a person not a
party to the proceedings); Davis v. Weatherston, No. 04-00-0533-CV, 2002 Tex. App. Lexis
3194 (Tex. App.-San Antonio, May 8, 2002, no pet.) (not designated for publication)
(holding that since a declaration of rights would not affect one not made a party to the suit,
the trial court's jurisdiction was not compromised). 

 Given the foregoing, we must conclude that the trial court did not abuse its discretion
in rejecting the Davises' complaint about the absence of the Trust. So, we overrule the
issue.

Point Two - The 1991 and 1997 Agreements


 In their second point, the Davises contended that 1) Devon entered into two
agreements which prohibited the use of caliche on the roads, 2) Devon is bound by those
agreements, and 3) the evidence is legally and factually insufficient to support the finding
that it is not. We overrule the point.

 The construction or interpretation of a document is a question of law. Elliot-Williams
Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999); Cross Timbers Oil Co. v. Exxon Corp., 22
S.W.3d 24, 26 (Tex. App.-Amarillo 2000, no pet). Thus, it follows that the extent of an
obligation, if any, imposed by a contract is also a question of law since it is obviously
dependent upon the interpretation of the contract. And, unless its terms are ambiguous, 
we look only to the words of the instrument to assess what it means and the extent of the
obligations imposed, if any. National Union Fire Ins. Co. v. CBI Industries, Inc., 907 S.W.2d
517, 520 (Tex. 1995). 

 As to the existence of an agreement prohibiting the construction of caliche roads,
we turn to the letters purporting to illustrate the accord. The first is dated June 25, 1991. 
Written by Chevron U.S.A., Inc., a predecessor in interest to Devon, it is addressed to the
Davises. In it, Chevron alluded to a meeting with the Davises and stated, among other
things, that the "main purpose of this letter is [to] confirm our understanding of the major
operating points we discussed." With respect to roads, Chevron said:

 Chevron has the legal right to build and maintain roads in the Unit that are
reasonable for our production operations. While the courts have stated
twenty (20) foot permanent roads are "standard" we feel ten (10) foot dirt
roads for our infield well operations are preferred because this will keep the
roads level with the fields and will help them to drain better. Also dirt roads
will enable your cotton operations to be more economical by being able to
plow over them. Immediately after the planting is completed, you can then
restore the roads. 

 

 We also see the need for improved road maintenance by Chevron. The
roads should be passable under reasonable circumstances and enable us
and our contractors to get to the wells without having to drive out of the road
beds and on to your crops. Your offering to provide us with surplus road
building materials is greatly appreciated for the areas that are currently in
need of greatest repair.


As can be seen, this provision said nothing about "caliche" or the construction of "caliche
roads." Nor did the words used, when given their plain meaning, expressly illustrate an
agreement to forego building caliche roads. At best, they evinced Chevron's desire for ten
foot dirt roads. But, that it may have "preferred" building dirt roads of that size falls short
of a promise to only construct roads of that size and type in perpetuity. (2) This is especially
so given the lack of words which can reasonably be read as a promise by Chevron to
restrict itself to a particular type road. 

 In short, that one may "prefer" coffee over tea does not mean he can never drink tea. 
Similarly, that Chevron may "prefer" narrow dirt roads does not alone contractually bar it
( or its successors) from building wider permanent roads out of caliche. At the very least,
nothing in the June 1991 letter evinces an intent to so restrict the company. 

 The second letter mentioned is dated May 21, 1997, and was sent to the Davises
by Pennzoil Exploration and Production Company, another predecessor in interest to
Devon. Furthermore, it dealt with the actions of contractors appearing on the land to
perform work for the company. And, like the 1991 missive, it too said nothing about the use
of caliche or making caliche roads. Nor did it even address the matter of building roads. 
Given this, we cannot read into the document a subject not addressed or intent not
described therein. Cross Timbers Oil Co. v. Exxon Corp, 22 S.W.3d at 26-27. 

 There being no agreement prohibiting the use of caliche roads, we need not
determine whether Devon was bound by them. Nor need we address the topics of legal
and factual sufficiency raised by the Davises. 

Point Three - Use of Caliche


 Via their third point, the Davises question the sufficiency of the evidence to support
the trial court's finding that the use of caliche was reasonably necessary. We overrule the
point.

 It is clear that the right to minerals in place carries with it the rights to enter and
extract them and all other incidents thereto as are necessary to the enjoyment of those
rights. Tarrant County Water Control & Improvement Dist. v. Haupt, 854 S.W.2d 909, 911
(Tex. 1993). In other words, the lessee of a mineral lease has the right to use as much of
the premises in such a manner as is reasonably necessary to effectuate the purpose of the
lease. Ball v. Dillard, 602 S.W.2d 521, 523 (Tex. 1980). Yet, our Supreme Court has seen
fit to protect the owners of the surface estate to some extent. And, the protection invoked
by the Davises on appeal was first enunciated in Getty Oil Co. v. Jones, 470 S.W.2d 618
(Tex. 1971). Recognizing that the lessee may use as much of the premises as is
reasonably necessary to produce and remove the minerals, the Court nonetheless held that
the lessee must exercise its right with due regard for the rights of the servient estate, i.e.
the surface owner. Id. at 621. This concept has come to be known as the accommodation
or alternative means doctrine. Tarrant County Water Control & Improvement Dist. v. Haupt,
854 S.W.2d at 911. And, in applying it, the Supreme Court stated that when there is an
existing use of the land's surface by the surface owner which would be precluded or
impaired, and when under established practices in the industry there are alternatives
available to the lessee whereby minerals can be recovered, the circumstances "may require
the adoption of an alternative by the lessee." Id. at 911, quoting Getty Oil Co. v. Jones,
supra. Yet, this right of accommodation is dependent upon the evidence and findings by
the trier of fact. Id. That is, whether the elements for accommodation have been
established is a question of fact determined by the evidence presented to the trier of fact. 


 Furthermore, in explaining the doctrine in Getty, the Supreme Court viewed it as an
extension of another holding it had previously made. That holding appeared in Acker v.
Guinn, 464 S.W.2d 348 (Tex. 1971). There, the Court discussed the nature of the estates
created by the execution of a mineral lease. While doing so, it noted that while the owner
of the lease acquires the dominant estate and the right to make reasonable use of the
surface, "[i]t is not ordinarily contemplated . . . that the utility of the surface for agricultural 
or grazing purposes will be destroyed or substantially impaired." Id. at 352. And, it is the
language we quote that the Court in Getty deemed instructive. Getty Oil Co. v. Jones, 470
S.W.2d at 621-22. It indicated the need for a "due regard" of the surface owner's interests 
and helped define what to consider in determining whether a surface use by the lessee is
reasonably necessary. Id. 

 We too find that language instructive in assessing the scope of the accommodation
doctrine. And, the words found particularly instructive are those suggesting it is not
contemplated that the surface will be used by the lessee in a manner that "destroyed or
substantially impaired" its agricultural use. (Emphasis added). Together, they connote the
need for something more than slight interference. Indeed, we gather from their use that not
every impairment to the surface owner's utilization of the surface is enough. Rather, only
when the conduct of the lessee destroys or substantially impairs the surface owner's use
of the surface does the question arise as to whether that conduct is reasonably necessary. 
Given this and the fact that the Supreme Court relied on Acker in deriving the alternative
means doctrine, it is reasonable to infer that the latter must apply only when the impairment
experienced by the surface owner is, at the very least, substantial. With this said, we turn
to the dispute before us. 

 Appearing in the record is evidence that 1) at one time, roads in a portion of the Unit
and on the Davises' property had been caliche but had fallen in disrepair, 2) the current
lease roads were not compacted because the Davises frequently plowed them up, 3) the
roads were often just two tire tracks down a field, 4) the Davises' circular irrigation system,
which was not in use at the time oil and gas operations commenced on the property, kept
the roads muddy during the irrigation season, 5) the irrigation season approximated 180
days a year, 6) if a vehicle was unable to travel down a road, it would have to back up
sometimes as much as a quarter of a mile to turn around, 7) trucks or heavy equipment
were needed to service, drill and operate the wells, 8) sometimes those trucks and
equipment had to be pulled out with a bulldozer, 9) lease operators who checked the wells
for leaks or problems sometimes had to walk to a well location because the roads were
impassable, 10) in a three month period, 248 proposed well treatments were cancelled
because roads did not allow passage to the wells, 11) on one vehicle, the brakes had to
be replaced six times in the first 32,000 miles due to the sandy and muddy roads, 12)
during a safety drill, an emergency vehicle could not access the well location due to the
Davises having plowed across the road, 13) usual and customary industry standards
dictate the need for an "all weather road" to access well sites, 14) one expert was
surprised by the lack of "a decent all weather road [at the Unit] that would allow the
operator . . . to conduct [its] business and have access to the well and batteries," 15)
 an operator needs access via "all weather roads, and that means caliche," 16) an
operator has "got to have caliche pads to set equipment," 17) "[i]t's going to be
extremely difficult to operate this unit [via secondary and tertiary recovery] going
forward with increased technology, increased activity without having all weather
roads and pads," and 18) the Davises used caliche around their house and to build a
ramp to facilitate the operation of the irrigation system. So too was there evidence that the
caliche would not cause the Davises a problem as long as they kept their plow out of it, that
while Floyd Davis may not be able to always keep his plow out of the caliche, a farmer
could pick up his plow behind his tractor to avoid plowing caliche into his field, that the
Davises, if they so choose, could probably avoid plowing into a caliche road, that caliche
rock could be crushed to smaller, less troublesome sizes, that caliche appears naturally
under certain portions of the Davis farm, and that plowing in the past has brought some of
this naturally appearing caliche to the surface. 

 The foregoing constitutes some evidence supporting the factfinder's conclusion that
Devon's "use and proposed use [i.e., building permanent caliche roads] of the Property is
reasonable and necessary. . ." and that the use of caliche as a road building material "is
not unreasonable." And, upon considering the totality of the evidence, we cannot say that
the determination is so against the great weight and preponderance of the evidence as to
be manifestly unjust. Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex 1986), overruled
on other grounds by Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378 (Tex. 2000) (discussing
the standard of review applicable when assessing whether a finding is supported by
factually sufficient evidence). 

 As to the Davises' claim regarding the accommodation doctrine, we are cited to no
evidence indicating that construction of permanent caliche roads would destroy their ability
to conduct a profitable farming operation. (3) And, though there exists some evidence
suggesting that caliche may cause them problems, the trial court could have reasonably
concluded, from the record before it, that any impairment had an insubstantial impact on
the farming operations. Furthermore, such a finding would enjoy the support of both legally
and factually sufficient evidence. 

Point Four - Interference with Mineral Production


 Via their fourth and final issue, the Davises argue that the evidence was legally and
factually insufficient to support the trial court's finding that they interfered with Devon's
production of minerals. We overrule the issue.

 According to the record, the trial court found that the Davises had "unreasonably
restricted Plaintiff's rights of ingress and egress to the Property," "unreasonably restricted
Plaintiff's reasonable and necessary use of the surface of the Property," and "unreasonably
restricted Plaintiff from its full use of the Property." These findings are supported by the
following evidence: 1) Floyd Davis stopped a contract crew on March 16, 2001, told them
they could not work, and the crew left the property; 2) on another occasion, Floyd Davis
threatened to "whip" a Devon employee; 3) Lloyd Davis ordered the same Devon employee
off his property on a separate occasion while clutching a ballpeen hammer; 4) Floyd Davis
told another Devon employee that he was willing to die for his farm and asked if the
employee was willing to die for his company; 5) Floyd Davis cursed at Devon's employees
and contractors; 6) the Davises told Devon that they will not allow Devon to use caliche for
roads; 7) Floyd Davis would not allow a contractor's employee, who had driven his vehicle
off the lease road to go around Davis's vehicle, to leave the premises and called the sheriff;
8) Floyd Davis testified he would continue to exercise his right to instruct Devon's
employees and contractors about what to do on his land and that there would be "trouble"
if caliche was used on his farm; and 9) Floyd Davis testified that he would continue to plow
over the lease roads. This is both legally and factually sufficient evidence to support the
trial court's findings. 

 As to the contention that the Davises could not have unreasonably interfered with
Devon's use of the property because they were only attempting to enforce the 1991 and
1997 agreements, we previously determined that no such agreements existed regarding
the construction of permanent caliche roads. Thus, the documents cannot be used to
justify the Davises' actions. 

 Having overruled each issue, the judgment of the trial court is affirmed.


 Brian Quinn

 Justice
1. Myrtle Davis is the mother of Floyd and Lloyd Davis.
2. We assume, arguendo, that caliche roads fall outside the category of dirt roads. The letter does not
address that.
3. We assume, arguendo, that the issue was preserved for appeal. The record does not disclose
whether the Davises requested the trial court to make any particular findings on the matter, though the topic
is broached on appeal. Nor do the findings actually entered by the court expressly address the
accommodation doctrine. See Eberts v. Businesspeople Personnel Serv., Inc., 620 S.W.2d 861, 862 (Tex.
Civ. App.-Dallas 1981, no writ) (holding that defense urged on appeal was waived because the trial court did
not address it in its findings and the defendant failed to request additional findings).