FILED
United States Court of Appeals
Tenth Circuit

December 26, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARVIN BAY; MILDRED BAY, Co-
Trustees of the Bay Family Trust,

     Plaintiffs - Appellants,

and

VERNON JESSER; MARY JESSER;
KENT J. MCDANIEL; DEANNA R.
MCDANIEL,

     Plaintiffs,

v.

ANADARKO E&P ONSHORE LLC;
ANADARKO LAND CORPORATION,

     Defendants - Appellees.

No. 17-1374

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:09-CV-02293-MSK-MJW)**
_____

Sean Connelly of Connelly Law, LLC (Stacy A. Burrows and George A. Barton of Law Offices of George A. Barton, P.C., Overland Park, Kansas, Lance F. Astrella and Steven Louis-Prescott of Astrella Law, P.C., Denver, Colorado, Donald M. Ostrander of Hamre, Rodriguez, Ostrander & Dingess, Denver, Colorado, with him on the briefs), Denver, Colorado, for Plaintiffs - Appellants.

David G. Palmer (John Voorhees, John K. Crisham, Jeffrey M. Lippa, Harriet Retford, and Lindsay N. Uhl of Greenberg, Traurig, L.L.P, with him on the brief), Denver, Colorado, for Defendants - Appellees.

_____

Before **McHUGH**, **KELLY**, and **MORITZ**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

This appeal concerns a trespass claim by Plaintiffs-Appellants Marvin and Mildred Bay that Defendants-Appellees Anadarko E&P Onshore LLC and Anadarko Land Corp. (together, "Anadarko"), through their lessee, exceeded the scope of an easement by using excessive surface land to drill for oil and gas. The district court had diversity jurisdiction over the case and entered final judgment against the Bays pursuant to Federal Rule of Civil Procedure 54(b). See 4 Aplt. App. 883–84.

We decide whether a deed reserving mineral rights in land — and the specific right to use the surface as "convenient or necessary" to access the minerals — requires applying a different test than the one prescribed in Gerrity Oil & Gas Corp. v. Magness, 946 P.2d 913, 927 (Colo. 1997), to evaluate whether the mineral owner's use of land constitutes a trespass. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that it does not and we therefore reverse and remand for further proceedings.

**Background**

The Bays are farmers in Weld County, Colorado, who (through a family trust) own the surface estate of their land. 6 Aplt. App. 1234, 1236, 1241. Their deed can be traced back to 1907, when the Union Pacific Railroad Company conveyed the surface to the Bays' predecessors in interest but reserved the underlying mineral estate. See 9 Aplt.

2

App. 1984.  Specifically, the deed reserved to "Union Pacific Railroad Company, its successors and assigns":

> First.  All coal and other minerals within or underlying said lands.
>
> Second.  The exclusive right to prospect in and upon said land for coal and other minerals therein, or which may be supposed to be therein, and to mine for and remove, from said land, all coal and other minerals which may be found thereon by anyone.
>
> Third.  The right of ingress, egress and regress upon said land to prospect for, mine and remove any and all such coal or other minerals; and the right to use so much of said land as may be convenient or necessary for the right-of-way to and from such prospect places or mines, and for the convenient and proper operation of such prospect places, mines, and for roads and approaches thereto or for removal therefrom of coal, mineral, machinery or other material.

Id. (emphasis added).[1]

The Bays' farm sits above a large oil and gas deposit called the Wattenberg Field. 5 Aplt. App. 1018.  Prior to 2000, Union Pacific would enter into agreements with surface owners before drilling for oil or gas.  8 Aplt. App. 1719.  These agreements typically included payments to surface owners and also provided that Union Pacific would pay for surface property damages, including damages to crops.  6 Aplt. App. 1132. In 2000, Anadarko bought Union Pacific's mineral rights in the Wattenberg Field, 4 Aplt. App. 831, and discontinued the practice of entering into agreements with surface owners, 8 Aplt. App. 1720.[2]

---

[1]  "Other minerals" includes oil and gas resources under Colorado law.  McCormick v. Union Pac. Res. Co., 14 P.3d 346, 348 (Colo. 2000).

[2]  The parties have competing theories regarding why Union Pacific entered into agreements with surface owners.  The Bays theorize that the agreements were used to

In 2004, Anadarko leased the mineral rights beneath the Bays' farm to United States Exploration, which drilled three vertical wells on the Bays' south farm. 4 Aplt. App. 831–32. Noble Energy bought United States Exploration in 2006, and Noble drilled four additional vertical oil and gas wells on the Bays' north farm between 2007 and 2011. Id. at 832. According to Anadarko, 97% of wells drilled in the Wattenberg Field had been drilled vertically up to 2007. 8 Aplt. App. 1635.

Despite the prevalence of vertical drilling at the time, the Bays asked Noble Energy to drill directionally instead because directional drilling would require using fewer well sites, thus reducing the surface impacts on the Bays' property.[3] 6 Aplt. App. 1275–76. Noble Energy responded by requesting $100,000 per well to drill directionally and, when the Bays refused, proceeded to drill vertically. Id. at 1277–79. As a result, the Bays have seven wells on their property when they contend there could be as few as two. 4 Aplt. App. 832; Aplt. Br. at 6. They argued that this surface use constituted a trespass.

avoid excessive-surface-use claims, like the one at issue here. See 6 Aplt. App. 1132. Anadarko contends that the agreements were used because it was unclear what mineral rights reservations "other minerals" included until the Colorado Supreme Court's decision in McCormick, 14 P.3d at 348 (holding that "other minerals" includes oil and gas). According to Anadarko, the agreements were no longer necessary after McCormick. 8 Aplt. App. 1720.

[3] We provide a brief description of the differences between vertical and directional drilling to better contextualize the dispute. As its name suggests, a vertical well is drilled vertically, i.e., straight down from the drill pad and into the surface beneath the drilling rig. 5 Aplt. App. 1022. By contrast, a directional well begins as a vertical well, but then makes a modest deviation (at angles of 15 to 23 degrees) after the first 1,000 to 1,500 feet. Id. This allows the bottom of the well to reach a location that is not directly below the drill rig, and therefore allows operators to reach multiple locations from the same drill pad. Id. Directional drilling should not be confused with horizontal drilling, where the well starts vertically but then is turned 90 degrees so that the drill hole is completely horizontal. Id. at 1023.

4

A-W Land Co. v. Anadarko E&P Co. (A-W Land Co. I), No. 09-CV-02293-MSK-MJW, 2015 WL 4464414, at *2 (D. Colo. July 22, 2015).

The Bays filed a putative class action against Anadarko on behalf of themselves and similarly situated surface owners, which was certified for the purpose of addressing common questions of law. See A-W Land Co. I, 2015 WL 4464414, at *2. In two orders (one issued after additional discovery and briefing), the district court answered two questions relevant to this appeal: (1) "how the terms of the surface reservation in the Union Pacific deeds should be interpreted" and (2) "whether Anadarko itself can be held liable for any trespasses on the Plaintiffs' land committed by its lessees." See id.; A-W Land Co. v. Anadarko E&P Co. (A-W Land Co. II), No. 09-CV-02293-MSK-MJW, 2017 WL 1023375, at *6 (D. Colo. Mar. 16, 2017).

The district court first interpreted the portion of the deed granting Anadarko the right to use as much of the surface as is "convenient or necessary" to access the underlying minerals, given the background rule of reasonable use in Gerrity. A-W Land Co. I, 2015 WL 4464414, at *4. It determined that the term "convenient" in the 1907 deed should be viewed from the mineral owner's perspective (here, Anadarko) rather than the surface owner's perspective. Id. at *6. It also concluded that the phrase "convenient or necessary" granted Anadarko (or its lessee) the right to decide which method of drilling "it deems most suitable in a given situation," "even if one alternative will result in greater surface disruption than the other," so long as the method is not "commercially unreasonable or contrary to accepted industry practices." Id. at *8. Thus, whereas Gerrity, which we will discuss in much more detail, would require an operator to

5

choose the least disruptive of two reasonable alternatives, the district court concluded that the "convenient" clause grants the operator the right to decide which reasonable alternative to select. Id.

Second, the district court decided whether Anadarko could be held vicariously liable for its lessee's trespasses. See id. at *8–11. It noted that Anadarko could theoretically be held liable but declined to make a ruling on a class-wide basis, determining that this question was factually intensive and required individual proof in each plaintiff's case. Id.

After addressing all the questions of law capable of resolution on a class-wide basis, the district court decertified the class and directed the parties to select a plaintiff for a bellwether trial. See A-W Land Co. II, 2017 WL 1023375, at *7. The district court also affirmed its earlier interpretation of the deed reservation, id. at *2–6, and again deferred deciding the vicarious liability issue until trial. Id. at *6. The Bays were selected as the bellwether plaintiffs, and their case proceeded to a jury trial with five days of testimony.

At trial, the Bays adduced testimony about how the drilling operations and well sites had affected the surface land and their ability to farm. Mr. Bay testified that the equipment used to drill the wells occupied a space of two to two-and-a-half acres during the three to five days that a well is drilled. 6 Aplt. App. 1315–16. He noted that the equipment compacts his farmland, making the land less productive. Id. at 1315. Once drilling is completed and the wells are finished, the wellheads occupy a space between 100 to 196 square feet (i.e., 10-by-10 to 14-by-14 feet). Id. at 1316. These wellheads

6

make it more difficult for Mr. Bay to tend fields because some of his farming machinery is very wide (up to 66 feet) and the wellheads impede his free movement over the land in this machinery. Id. at 1311–12. In addition, the wellheads and buried flow lines emanating from them made operating his center-pivot irrigation sprinklers more difficult. Id. at 1313–14. Mr. Bay concluded by testifying that he was concerned about the possibility of asbestos and radiation contamination resulting from the operations, but he admitted to having no direct knowledge of any such contamination during cross examination. Id. at 1324–25, 1327–28; 7 Aplt. App. 1425.

The Bays, however, did not produce any evidence that vertical drilling was contrary to industry practice or commercially unreasonable (i.e., evidence showing that vertical wells were "inconsistent with prevailing standards in the oil and gas industry at the time"), despite the district court's earlier ruling requiring such a showing. 9 Aplt. App. 1974, 1976–77. Indeed, it is unlikely that the Bays could have produced such testimony when vertical drilling remained a common technique in the Wattenberg Field. Id. at 1974; see 8 Aplt. App. 1633, 1638–39.

On the sixth day, after the close of both parties' cases, Anadarko moved for judgment as a matter of law (JMOL), arguing that (1) the Bays had consented to any trespass; (2) Anadarko could not be held vicariously liable for Noble's conduct; (3) the Bays, as trustees, could not collect damages for discomfort and annoyance; and (4) the Bays failed to present evidence sufficient to show other damages. See 9 Aplt. App. 1889–99. After hearing the Bays' response, the district court then entered JMOL pursuant to Federal Rule of Civil Procedure 50(a). Id. at 1970, 1980. The district court

7

determined that Anadarko had produced unrebutted evidence that vertical drilling was commercially reasonable. Id. at 1976–78. Therefore, given the district court's earlier rulings, "Anadarko was free, consistent with the terms of the surface reservation, to allow its lessees to drill vertically rather than directionally. In such circumstances, the undisputed evidence compels the conclusion that the Bays could not establish their claim of trespass here." Id. at 1978.

Accordingly, the district court entered JMOL and, because the Bays were only two of many plaintiffs, directed entry of a final judgment against the Bays pursuant to Rule 54(b). Id. at 1981. On appeal, the Bays argue that Anadarko was not entitled to JMOL, and they ask that we reverse and remand for a new trial. Aplt. Br. at 25.

**Discussion**

We review a district court's decision under Rule 50(a) de novo and apply the same standards as the district court. Elm Ridge Expl. Co. v. Engle, 721 F.3d 1199, 1216 (10th Cir. 2013). Under Rule 50(a), the district court may enter JMOL in a jury trial if after a party has presented its evidence "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The district court may enter JMOL only if "the evidence points but one way" and "no reasonable inferences . . . may support the nonmoving party's position." Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting Elm Ridge Expl. Co., 721 F.3d at 1216). Thus, we draw all inferences in favor of the nonmoving party. Henry v. Storey, 658 F.3d 1235, 1238

(10th Cir. 2011).  We do not judge witness credibility.  Manzanares v. Higdon, 575 F.3d 1135, 1142 (10th Cir. 2009).

When a district court grants JMOL instead of submitting the case to a jury, we review the elements of the claim or defense at issue and discuss whether the nonmovant has satisfied those elements such that submission to a jury was required.  See, e.g., Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1126 (10th Cir. 2012).  Here, the district court premised its JMOL ruling on its earlier interpretation that the 1907 deed's surface reservation requires the plaintiff to show that the operator's surface use was "commercially unreasonable or contrary to accepted industry practices."  See 9 Aplt. App. 1973.  We review a district court's legal conclusions de novo and its factual findings for clear error.  Felix v. City of Bloomfield, 841 F.3d 848, 853 (10th Cir. 2016). Interpretation of a deed is a question of law.  Premier Bank v. Bd. of Cty. Comm'rs, 214 P.3d 574, 577 (Colo. App. 2009).  Whether an ambiguity exists is also a question of law, but if an ambiguity exists, the meaning of the ambiguous term is a question of fact. Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 918–19 (Colo. 1996).

## A.  The Gerrity Approach

Gerrity is the leading Colorado case addressing surface use rights held by mineral owners and the elements of trespass.  Amoco Prod. Co. v. Thunderhead Investments, Inc., 235 F. Supp. 2d 1163, 1171 (D. Colo. 2002).  Because the proper interpretation and application of Gerrity is essential to deciding this case, we spend significant time describing its facts, reasoning, and holding.  In Gerrity, the Colorado Supreme Court explained the scope of a mineral owner's privilege to access and use surface lands to

9

realize the value of its interest in the minerals. 946 P.2d at 926–29. If a mineral owner has not exceeded what was reasonable and necessary to access the relevant minerals, then it has not trespassed. Id. at 929.

The surface owner in Gerrity raised horses and cattle on the surface estate that had previously been severed from the mineral estate. Id. at 920. The mineral owner had leased its estate to an oil company that subsequently assigned the lease to the defendant, Gerrity Oil. Id. The land owner and Gerrity Oil had negotiated the placement of four well sites, but negotiations broke down after one of the wells was drilled. Id. Desiring to continue drilling the remaining three wells, Gerrity Oil requested that the district court enjoin the surface owner from preventing its access to the well site. Id. The surface owner counterclaimed, alleging that Gerrity Oil had acted negligently and trespassed when it (1) failed to properly and completely restore and remediate the drill sites, (2) left drilling mud and other substances in excavated pits, (3) failed to timely restore and remediate the drill sites, and (4) contaminated the property with hazardous, toxic, and controlled substances. Id. at 921. The trial court rejected the trespass claim on the ground that the surface owner failed to present expert testimony showing that Gerrity Oil had unreasonably operated and reclaimed the well sites. Id. at 922. The court of appeals reversed, holding that the surface owner was not required to produce expert testimony and that reasonableness is irrelevant to such a trespass claim. Id. at 922–23.

The Colorado Supreme Court granted certiorari to determine, inter alia, whether reasonableness is relevant to determine whether an operator's activities on the surface estate constitute trespass. Id. at 923 & n.3. After surveying its own precedent, the laws

10

in other states, and secondary authorities, the court adopted an approach that considers the reasonableness and necessity of an operator's surface use, see id. at 926–29, and held: "[T]he appropriate inquiry on a trespass claim based on an operator's excessive surface use is whether the operator's surface use exceeded that which was reasonable and necessary to access the mineral estate." Id. at 929. In reaching this holding, the court concluded that a mineral right is only valuable if it comes with an implied right to develop the mineral resource. Id. at 926.

In describing the reasonable use approach, Gerrity noted that a mineral owner may access and use "that portion of the surface estate that is reasonably necessary to develop the severed mineral interest." Id. (quoting Notch Mountain Corp. v. Elliott, 898 P.2d 550, 556 (Colo. 1995)). The court further noted, in light of the tension between a surface owner's and a mineral owner's rights, that the surface owner and the mineral owner "must have due regard for the rights of the other in making use of the estate in question." Id. at 927 (quoting Grynberg v. City of Northglenn, 739 P.2d 230, 234 (Colo. 1987)). The court also cited a Texas case, Getty Oil Co. v. Jones, 470 S.W.2d 618 (Tex. 1971), for the proposition that the "due regard" concept requires mineral owners to accommodate surface owners to the extent possible. Gerrity, 946 P.2d at 927.

Getty concerned a dispute that resembles the one between the Bays and Anadarko, and the Colorado Supreme Court appears to have relied on it. We therefore discuss the reasoning of Getty with particular relevance to this case. In Getty, a farmer sued to enjoin an oil developer (Getty Oil Co.) from using pumping units on its wellheads that were tall enough to obstruct the farmer's center-pivot irrigation system. 470 S.W.2d at

11

619–20. The farmer introduced evidence that he had no alternative means to irrigate his farm, and so the pumping units would have made it virtually impossible to farm. Id. at 622. He further introduced evidence that Getty could have recessed the pumping units several feet below the surface so that the irrigation system could pass over them unobstructed. Id. The Texas Supreme Court concluded that the surface owner had presented enough evidence to submit the trespass question to a jury because he produced evidence showing (1) that he would have to abandon his existing surface use because his alternatives to accommodate the pumping units were "impractical and unreasonable" and (2) Getty's use of the surface was not reasonably necessary because other reasonable means of producing the minerals were available. Id. at 623.

Mirroring the approach used in Getty, the Colorado Supreme Court detailed what evidence would be required to support a trespass claim based on unreasonable surface use and concluded that the plaintiff need not produce expert testimony. Gerrity, 946 P.2d at 933–35. The court prescribed a three-step burden-shifting approach to operationalize the accommodation and due regard analysis. See id. at 933–34. First, the surface owner must make a prima facie case by introducing evidence "that the operator's conduct materially interfered with surface uses." Id. at 933. The interference must be more than "inconvenient to the surface owner." Id. Instead, a material interference must be unreasonable from the perspective of the surface owner, considering only the effects on surface use. Id. Second, to rebut the prima facie case, the operator must show why its surface conduct was reasonable and necessary from its perspective by showing, for instance, that its operations conformed to standard customs and practices in the industry.

12

Id. Third, the surface owner may rebut the mineral owner's evidence with "evidence that reasonable alternatives were available to the operator at the time of the alleged trespass." Id. The court cited Getty in noting that rebuttal evidence would often rely on expert testimony because an expert would typically be needed to explain what less intrusive methods were available. See id. at 933 n.15. Finally, the ultimate decision whether the surface use was reasonable and necessary under the circumstances is a question for the trier of fact. Id. at 933–34.

## B. The Deed's "Convenient or Necessary" Clause Does Not Expand Anadarko's Rights Beyond Those Implied by Common Law

The district court concluded that the phrase "convenient or necessary" granted Anadarko (or its lessee) the right to decide which method of drilling "it deems most suitable in a given situation," "even if one alternative will result in greater surface disruption than the other," so long as the method is not "commercially unreasonable or contrary to accepted industry practices." A-W Land Co. I, 2015 WL 4464414, at *8.

In reaching this conclusion, the district court determined that "convenient or necessary" should be viewed from the mineral owner's perspective, meaning that the use should be either convenient for the mineral owner or necessary for the mineral owner. Id. at *6–7. In construing the deed, the court inferred that Union Pacific would have had no reason to include language in the deed other than to expand the mineral owner's rights when the common law rule of reasonable use was already established. Id. at *6. The Bays, however, argued that "convenient or necessary" is internally inconsistent when viewed solely from the mineral owner's perspective because it pairs a permissive with a

13

restrictive term.  See id. at *7.  The district dismissed this argument, noting that some of an operator's actions might be convenient for the operator but not necessary while others might be necessary but not convenient, and consequently, there is no inconsistency in reading the terms independently.  Id.

The district court then stated that the terms "convenient" and "necessary" are "properly interpreted according to their dictionary definitions," id. at *8, but it did not explicitly reference any dictionary to determine their definitions.  It noted, though, that "the plain meaning of the term 'convenient'" would be honored "by allowing Anadarko to choose the alternative that it deems most suitable in a given situation."  Id.  This suggests that the district court gave the term its modern meaning.  See Convenient, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/convenient (last visited Dec. 7, 2018) (defining "convenient" as "suited to personal comfort or to easy performance," "suited to a particular situation," or "affording accommodation or advantage").

We conclude that the district court erred when it interpreted the deed's language to expand the mineral owner's rights beyond the common law.  We reach this conclusion for several reasons.  First, under Colorado law, our goal when interpreting a deed is to give effect to the instrument by ascertaining the parties' intent at the time of execution. Notch Mountain Corp., 898 P.2d at 557; Dixon v. Abrams, 357 P.2d 917, 919 (Colo. 1960).  "Absent any ambiguity, the [parties'] intent should be determined from the four corners of the instrument," Notch Mountain Corp., 898 P.2d at 557, and a deed's words "should be given their plain meaning according to common usage."  Allstate Ins. Co. v.

14

Huizar, 52 P.3d 816, 819 (Colo. 2002). "When determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered." Hecla Mining Co. v. N.H. Ins. Co., 811 P.2d 1083, 1091 (Colo. 1991); cf. Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012) (referencing dictionaries from the time of a statute's enactment to determine the ordinary meaning of a word). Finally, reservations are construed more strictly than grants. Notch Mountain Corp., 898 P.2d at 557.

Some definitions of "convenient" from around 1907 suggest that the word took a more constrained meaning than it does today. The second edition of Black's Law Dictionary from 1910 defined "convenient" as "[p]roper; just; suitable." Convenient, Black's Law Dictionary (2d ed. 1910); see also Convenient, Merriam-Webster's Dictionary, supra (recognizing "suitable" and "proper" as obsolete definitions of "convenient"). This is very similar to how Black's defined "reasonable" in 1910: "Agreeable to reason; just; proper. Ordinary or usual." Reasonable, Black's Law Dictionary (2d ed. 1910).

On the other hand, some dictionaries contemporary with the execution of the 1907 deed suggest that "convenient" might be more broadly defined. The Bays argue that Webster's New International Dictionary of 1909 supports the understanding that "convenient" meant "fit or adapted, suitable, proper, becoming, appropriate," Aplt. Br. at 21, but Webster's described the Bays' preferred definition as "archaic." Convenient, Webster's New International Dictionary 491 (1909). Indeed, that same dictionary provides another definition: "suited to one's personal ease or comfort or to one's easy performance of some act or function; affording accommodation, advantage, or saving of

15

trouble; well adapted to one's ready use; handy." Id. Comparing dictionary definitions from around the turn of the century with more modern definitions supports the notion that the meaning probably was more constrained than the modern understanding.[4]

Second, the Colorado Supreme Court's interpretation of a deed with identical terms supports the understanding that the "convenient or necessary" clause does not grant mineral owners more rights than those already provided at common law. In Barker v. Mintz, 215 P. 534 (Colo. 1923), the Colorado Supreme Court interpreted an identical Union Pacific deed reserving "the right to use so much of said land as may be convenient or necessary for the right of way to and from such prospect places or mines." 215 P. at 534 (emphasis added). The court addressed, inter alia, whether the mineral owner could construct horse stables or corrals on the surface as part of its coal mining operations. See id. at 536. The court held that the mineral rights holder could do so, provided that the horses could not be "conveniently kept in the stables or corrals off the land in question" and that it was "reasonably necessary" to use the land, explaining that "[t]he use of the land for stables [or] corrals . . . might be the only convenient way the mines could be operated." Id. The court emphasized that "the question is whether it is necessary or reasonably convenient, taking into consideration the value of the land, the distance to

---

[4] Compare Convenient, Black's Law Dictionary (1st ed. 1891) (defining "convenient" as "proper; just; suitable;"), and Convenient, Webster's New Modern English Dictionary 204 (1922) (defining "convenient" as "suitable; appropriate; affording accommodation; handy"), with Convenient, Oxford English Dictionary, http://www.oed.com/view/Entry/40695 (last visited Dec. 7, 2018) (noting that the current sense of "convenient" is "[p]ersonally suitable or well-adapted to one's easy action or performance of functions; . . . the saving of trouble").

other available land, and all other circumstances." Id. This suggests that the clause "convenient or necessary" in a surface reservation permits uses of the land that are either "necessary" or are "reasonable" because requiring the fact-finder to consider the "value of the land, the distance to other available land, and all other circumstances" necessitates something very close to a reasonableness inquiry. See Gerrity, 946 P.2d at 933–34 (explaining that the trier of fact should balance the surface and mineral owners' competing interests to determine "whether, under the circumstances, the operator's surface use was both reasonable and necessary"). At the very least, Barker does not support the district court's interpretation that "convenient" permits a mineral rights holder to choose freely, as a matter of law, between two surface uses even if one will have a greater impact on the surface than the other.

Third, this understanding is consistent with the common law in other jurisdictions. In Baca Land & Cattle Co. v. Savage, 440 F.2d 867 (10th Cir. 1971), this court interpreted a similar deed from 1926 reserving logging rights in New Mexico instead of mineral rights in Colorado. There, we relied on New Mexico case law and held that the clause "necessary or convenient" "did not give the timber owner any arbitrary right but only the right to use such means as were reasonably suitable, giving due regard to the interest of the landowner." 440 F.2d at 873 (emphasis added).[5] For support, we cited a South Carolina Supreme Court opinion interpreting a 1902 deed and holding that the word "convenient" in a deed "gave defendant no arbitrary or unreasonable right, but it

---

[5] Recall that Gerrity used this same "due regard" phrase in explaining that the mineral rights holder must accommodate surface owners. 946 P.2d at 927.

17

was intended thereby to give defendant the right to use such means as might be reasonably convenient, suitable, or reasonably adapted to the end in view, having reasonable regard to the plaintiffs' reserved rights." Furman v. A.C. Tuxbury Land & Timber Co., 99 S.E. 111, 114 (S.C. 1919). Although Baca Land & Cattle Co. and Furman are not binding authority, they nevertheless illustrate the tendency of courts to interpret the word "convenient" to mean something similar to "reasonable" in early twentieth-century deeds.

We acknowledge cases from West Virginia and Kentucky interpreted instruments employing the term "necessary or convenient" from the early twentieth-century more broadly. In Comley v. Ford, 64 S.E. 447, 448 (W. Va. 1909), for example, the West Virginia Supreme Court interpreted a lease from around 1905 that had incorporated the terms of a reserved mineral right and noted that the "deed expressly gives, not only what is necessary, but what may be convenient as well," thereby suggesting a broader meaning of "convenient." Next, in McIntire v. Marian Coal Co., 227 S.W. 298, 299 (Ky. 1921), the Kentucky Supreme Court observed that the terms of a 1907 deed granting mineral rights and land use that is "deemed necessary or convenient" "could hardly be broader or more sweeping in favor of the grantee." Significantly, however, the use of "deemed" distinguishes the McIntire deed from the one at issue here given that "deemed" suggests a broader grant of rights because it leaves to the mineral owner the determination whether a

18

use is convenient. Moreover, the McIntire deed is broader in other respects,[6] and it granted rather than reserved mineral rights. 227 S.W. at 298.

Zeiler Farms, Inc. v. Anadarko E&P Co., No. 07-CV-01985-WYD-MJW, 2010 WL 2681724, at *5 (D. Colo. July 1, 2010), is likewise distinguishable. There, the District of Colorado found that drilling vertically rather than directionally was "necessary or convenient" under a surface owner's agreement. See id. at *5. The deed here was executed in 1907, whereas Zeiler Farms interpreted a surface owner's agreement from 1983. See id. at *1–2. As a result, Zeiler's interpretation relied on a modern definition of "convenient," see id. at *4, that is not necessarily applicable here.

Fourth, under Colorado law we doubt whether a deed's mineral reservation can expand surface or mineral ownership rights unless the reservation clearly defines the right. Gerrity notes that its rule applies "[i]n the absence of statutes, regulations, or lease provisions to the contrary." 946 P.2d at 926. Significantly, this list of exclusions does not include deeds. Indeed, creating a severed mineral estate requires a deed to accomplish the severance. See Radke v. Union Pac. R. Co., 334 P.2d 1077, 1088 (Colo. 1959) (noting that a severance requires "clear and distinct wording in the conveyance"). Thus, by definition, a deed — and its terms — will almost always be present in disputes between mineral and surface owners. Yet Gerrity never mentioned the terms of the deed

---

[6] For instance, it provides lengthy, enumerated lists of the types of uses that the mineral owner may make of the land. See McIntire, 227 S.W. at 298–99.

19

severing the surface from the mineral estate.[7]  Moreover, <u>Gerrity</u> cited two Colorado

cases in which the court looked to the language of the deed but did not conclude that the

deeds' language required the court to deviate from the common law approach.  <u>See</u> <u>Notch

Mountain Corp.</u>, 898 P.2d at 556–57 (concluding that the deed did not evince "intent to

create a surface interest greater than that which is normally recognized at law"); <u>Rocky

Mountain Fuel Co. v. Heflin</u>, 366 P.2d 577, 580 (Colo. 1961) (explaining that the mineral

owner "<u>by deed and general law</u> has the right of ingress and egress . . . and the right to

prospect for and carry on all necessary operations for the production of oil and gas"

(emphasis added)).

Although we do not decide how clear, explicit, or specific a deed must be to grant

the surface owner or mineral owner more rights than the due regard each already owes

the other under <u>Gerrity</u>, we conclude the deed's reservation was insufficient here.[8]

Accordingly, the reservation should not bestow the mineral owner with any rights beyond

those already provided at common law.

### C. The District Court Improperly Required the Bays to Show that the Operator's Use Was Not Commercially Reasonable

---

[7] The absence of the mineral owner from the dispute in <u>Gerrity</u> does not entirely explain why the court never discussed the deed's terms.  Although the lessee — not the mineral owner — was a party to the dispute, <u>Gerrity</u>, 946 P.2d at 920, the lessee's rights to use the land could be no more extensive than the rights of the mineral owner because the mineral owner could not grant more than it owned.  <u>See</u> <u>id.</u> at 927–29 (discussing the scope of the <u>mineral owner's</u> implied easement to assess whether the <u>lessee's</u> use was a trespass).

[8] Our earlier discussion of the varying definitions of "convenient" roughly contemporary with the deed does not weaken this conclusion because mineral "[r]eservations are construed more strictly than [] grant[s], and any ambiguities in a reservation are construed against the grantor."  <u>Notch Mountain Corp.</u>, 898 P.2d at 557 (citations omitted).

20

The district court concluded that the deed's "convenient or necessary" clause expanded the mineral owner's rights beyond the common law, and it consequently decided "that to fully honor the intention of the surface reservation, the rule of Gerrity had to be modified slightly." 9 Aplt. App. 1971–72. Gerrity provides that the surface owner may introduce evidence of a reasonable alternative at the rebuttal stage, but the district court modified the approach by requiring the Bays to present evidence that vertical drilling was "unreasonable and contrary to industry standards." Id. at 1977. As we have concluded, however, the deed did not expand Anadarko's rights beyond the right to reasonable surface use under common law. Consequently, requiring the Bays to meet an increased burden on rebuttal was inappropriate, and the district court should have applied the Gerrity test without any modifications.

Because we can affirm the district court for any reason supported by the record, we now apply Gerrity's burden-shifting approach to see whether the district court reached the correct result despite having applied an inappropriate test. See Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC, 887 F.3d 1003, 1032–33 (10th Cir. 2018).

1. The Surface Owner's Prima Facie Case

Under Gerrity, the surface owner must first prove a prima facie case by showing that an operator's conduct caused a material interference with surface uses. 946 P.2d at 933. The interference must be more than a mere inconvenience. Id. A surface owner may point to a statutory or regulatory standard of care to raise a presumption of material interference. See id. at 933 n.14. The inquiry considers only whether the interference is

21

unreasonable from the perspective of the surface owner, considering only effects on surface uses.  Id. at 933.  Beyond that, Gerrity offers little explicit instruction on what constitutes material interference.  Gerrity's facts, however, offer useful guidance.  There, the operator was alleged to have (1) failed to properly and completely restore and remediate the drill sites, (2) left drilling mud and other substances in excavated pits, (3) failed to timely restore and remediate the drill sites, and (4) contaminated the property with hazardous, toxic, and controlled substances.  Id. at 921.

The Getty case cited in Gerrity provides further guidance on what effects create a material interference and suggests that surface use must be infeasible or nearly impossible under the circumstances.  In Getty the surface owner entered evidence that he had no other way to irrigate his farm than to use center-pivot irrigation, and he would be unable to continue farming altogether without it.  470 S.W.2d at 622.  A more recent Texas case discussing the accommodation doctrine also provides helpful guidance on the meaning of material interference.  See Merriman v. XTO Energy, Inc., 407 S.W.3d 244, 249 (Tex. 2013).  Material interference is a high bar: "the surface owner has the burden to prove that . . . the lessee's use completely precludes or substantially impairs the existing use."  Id. (emphasis added).  Applying this standard, the Supreme Court of Texas reviewed whether summary judgment was appropriate when the surface owner had not proved he had no reasonable alternative means to conduct some of his essential cattle operations.  See id. at 250–52.  The surface owner alleged that the mineral owner's well prevented him from continuing his livestock operations because it blocked the area where he loaded the animals.  Id. at 251.  Ultimately, the court concluded that evidence showing

that the well "precludes or substantially impairs the use of his existing corrals and pens" without a showing that the "surface owner has no reasonable alternative method to maintain the existing use" was not sufficient to advance beyond summary judgment. Id. at 252.

Given the factual differences between the Bays' claims, Gerrity, and the aforementioned Texas authorities, we question whether the record before us supports a legally sufficient finding of material interference. But we do not resolve this issue because Anadarko has not raised it on appeal;[9] therefore, we do not affirm the district court on this basis.

### 2. Mineral Owner's Burden of Production

After the surface owner makes a showing of material interference, the mineral owner must then produce evidence to explain the necessity of its conduct and to show that its conduct conformed to industry practices. Gerrity, 946 P.2d at 933. Here, Anadarko's expert witness explained how vertical drilling was consistent with industry practices and presented fewer technical risks than horizontal drilling. 8 Aplt. App. 1664; see id. at 1639–42, 44–49, 1651–55, 58–61.

### 3. Surface Owner's Rebuttal

Once the mineral owner satisfies its burden of production, the surface owner may provide rebuttal evidence that reasonable alternatives were available to the operator.

---

[9] We note, however, that the district court and Anadarko contemplated that the plaintiffs were required to satisfy this element at trial. See A-W Land Co. I, 2015 WL 4464414, at *5; Anadarko's Fourth Proposed Jury Instr., 4 Aplt. App. 877.

Gerrity, 946 P.2d at 933. Then, "it is the province of the trier of fact to balance the competing interests of the operator and surface owner and objectively determine whether, under the circumstances, the operator's surface use was both reasonable and necessary." Id. at 933–34. Here, the Bays adduced testimony that directional drilling offered a feasible alternative to horizontal drilling. A petroleum engineer, Jack McCartney, modeled the expense and expected revenue of using directional rather than vertical wells. See 5 Aplt. App. 1045–1051. Based on this modeling, he testified that directional wells offered a technically feasible alternative and would have been profitable. Id. at 1044–45.

Anadarko argues, however, that the Bays failed to satisfy their burden under Gerrity because the Bays did not offer evidence that vertical drilling was unreasonable or that the proposed alternative was "more reasonable." Aplee. Br. at 42–45. This argument misunderstands Gerrity. Nowhere does Gerrity require the surface owner to show that another alternative was "more reasonable." Instead, Gerrity's third step permits the surface owner to introduce evidence that "reasonable alternatives were available." 946 P.2d at 933. Once the surface owner has done so, "it is the province of the trier of fact to balance the competing interests of the operator and surface owner and objectively determine whether . . . the operator's surface use was both reasonable and necessary." Id. at 933–34. Accordingly, we conclude that the district court erred in granting JMOL in favor of Anadarko with respect to the Bays' trespass claim.

### D. We Cannot Conclude as a Matter of Law that Anadarko May Not Be Held Vicariously Liable for Noble's Potential Trespass

24

In the alternative, Anadarko argues that the Bays failed to present evidence that Anadarko can be held vicariously liable for any of Noble Energy's alleged trespasses. Because the district court granted JMOL based on the trespass theory, it did not rule on this issue. See Aplt. App. 1970–80. Anadarko nevertheless asks the court to affirm because JMOL would have been warranted even if the district court erred when it ruled that the Bays had failed to establish their trespass claim as a matter of law. See Aplee. Br. at 57–60. Again, we may affirm for any reason supported by the record. See Spring Creek Expl. & Prod. Co., 887 F.3d at 1032–33.

Ordinarily, a lessor is not liable for its lessee's trespasses. See Orphan Belle Mining & Milling Co. v. Pinto Mining Co., 85 P. 323, 324 (Colo. 1906); 58 C.J.S. Mines and Minerals § 294 (2018). However, a lessor may be liable if it authorized or ratified the trespass. See Zobel v. Fanny Rawlings Mining Co., 111 P. 843, 844 (Colo. 1910) (ratification liability); Engler v. Hatch, 472 P.2d 680, 682 (Colo. App. 1970) (authorization liability); 58 C.J.S. Mines and Minerals § 294 (both). We leave this for the district court to consider at the appropriate time.

REVERSED and REMANDED for further proceedings consistent with this opinion.